[Filed December 8, 1890.]

## STATE EX REL. DURKHEIMER ET AL. v. W. E. GRACE.

PARTIES—PUBLIC RIGHT.—When the question is one of public right, and the object of the mandamus is to enforce the performance of a public duty, it is sufficient for the relator to show that he is a citizen of the county, and as such is interested in the execution of the laws.

COUNTY SEAT—LOCATION—VOTES.—Where an act of the legislature, after providing that the town of Harney shall be the temporary county seat of the county (which was a newly-organized county) until otherwise located, as provided by the act, proceeds: "At the next general election, the question of the location of the county seat shall be submitted to the legal voters of the county, and the place receiving a majority of all the votes cast shall be the permanent county seat of the county"; held, that the words "a majority of all the votes cast" refer to the place receiving them, and means on the question of the location of the county seat, and not on some other question for which votes may have been cast at such election.

Harney county. M. D. CLIFFORD, Judge.

Defendant appeals.    Reversed.

This is a proceeding for a mandamus to require and direct the defendant to keep the office of county clerk in the town of Burns, the alleged county seat of Harney county. The facts, in substance, are these: The petitioners allege that they are residents within the county and legal voters and taxpayers therein, etc., and that the town of Burns is situated in said county of Harney; that the defendant was and now is the duly-qualified and elected county clerk of said county, and by virtue of his official position, is now and at all of said times has been in possession of the public records, documents, etc., which, by the laws of the state, are records

of the county clerk's office, and that the same are now and have been at all times held and kept by him in the town of Harney, within said county; that by an act of the legislative assembly, approved February 25, 1889, the county of Harney was created one of the counties of the state of Oregon, and that among other things it was provided that the said town of Harney should be the temporary county seat until otherwise located by said act, which further provided that at the next general election the question of the permanent location of the county seat of said county should be submitted to the legal voters of said county, and that the place receiving the majority of all the votes cast therefor should be the county seat of said county, etc.; that the permanent location of the same was duly submitted to the legal voters as provided by said act, and thereafter the vote cast was duly canvassed, etc.; that upon such canvass it was found that the town of Burns received 512 votes, all of which were so polled and voted by the legal voters of said county in favor of locating the county seat at Burns, and that said 512 votes was a full majority of all the votes cast at said election on the said question of the permanent location of the county seat of said county, etc., and that by reason thereof the said town of Burns became the permanent county seat of said Harney county, and is the only proper and legal place in said county for keeping the county records, files, documents, etc., of which the defendant herein now holds and has possession and custody as said county clerk, and by virtue of the act as aforesaid the town of Burns is the only legal place in said county where the office of county clerk can be legally held, etc.; that the defendant as such county clerk now keeps and maintains, etc., all said records, files, etc., at the town of Harney, and conducts the office and official business there, all of which is against the will of the legal voters of said county, and that the defendant unlawfully refuses to recognize the said town of Burns as the said permanent county seat, and unlawfully neglects and refuses to remove the records, etc., from Harney to the said town of Burns; that

the defendant refuses for the reason that he sayeth that the said town of Burns did not receive the majority of all the votes cast, etc., but your petitioners allege that the total of all the votes cast at the election upon the question of the permanent county seat was the sum total of 1,016 votes, and no other or greater number; that by reason of such neglect and refusal, etc., your petitioners pray, etc. Upon this petition an order was made for the issuance of a peremptory writ, from which this appeal is taken.

*Thornton Williams*, and *W. W. Thayer*, for Appellant.

*Williams & Wood*, and *Rufus Mallory*, for Respondent.

LORD, J.—Two questions are presented by this record: (1) That the petitioners as relators do not have such an interest in the subject matter as to authorize them to institute such a proceeding, and (2) that the petition does not state facts sufficient to constitute a cause of action, in that it does not show that the town of Burns in the election received a majority of the votes cast for a permanent county seat, as found by the canvass of such votes. Upon the first point, the contention is, that the fact that the petitioners are residents, legal voters and taxpayers of Harney county does not vest in them any particular interest or right distinct from the public at large. Our statute provides that the writ shall be allowed by the court or judge thereof, upon the petition, verified as a complaint in an action, of the party beneficially interested. (*Hill's Code*, § 594.) It has been held that a petitioner who is a taxpayer within the district of which the defendant is assessor is "a party beneficially interested" in having all the taxable property in the district assessed. (*Hyatt* v. *Allen*, 54 Cal. 353). And it would seem, upon like principle, that the petitioners who are voters and taxpayers within the county of which the defendant is county clerk is "a party beneficially interested" in having the records of the county clerk's office at the county seat of the county, and is, therefore, a proper party to petition for the issuance of the writ. But if there should be any doubt on the suggested analogy to justify its

issuance, the case of *State ex rel. Field v. Saxton et al.* 11 Wis. 27, discloses that one of the reasons assigned for quashing the writ there was that the relator did not state any right which entitled him to the relief prayed for; yet the court denied the motion, holding that a proceeding by a writ of mandamus was the proper remedy to test the result of an election as to the removal of a county seat and to compel a sheriff or other county officer to hold or keep his office at the place to which it is alleged to have been removed. When the question is one of public right, and the object of the mandamus is to enforce the performance of a public duty, it is sufficient for the relator to show that he is a resident and citizen of the county, and as such is interested in the execution of the laws. (*State v. Ware,* 13 Or. 380.) That the defendant, as county clerk, should keep the office of county clerk at the county seat, as required by law, is a subject-matter in which the relator, as a citizen and voter of the county, has a general interest, and in the absence of any other objection affecting the remedy by mandamus, that interest is sufficient to enable him to maintain this proceeding. When the law appoints a place for a county seat and fixes its officers thereat, it is a matter of public right, in which all the citizens of the county are interested, that the officers should be kept at that place for the transaction of the public business. Such being the case, the relators, as residents, voters, and taxpayers, are "parties beneficially interested" in the execution of the laws, and as such are entitled to enforce the performance of duty which devolves upon such officers to keep their offices at the county seat by the writ of mandamus. While the authorities indicate some diversity of judicial opinion upon the question whether private persons can sue out the writ to enforce the performance of a public duty, unless its neglect entails some special injury or affects some particular interest, the decided preponderance of American authority, Mr. Justice Miller thinks, is "in favor of the doctrine that a private person may move for a mandamus to enforce a public duty not

due to the government as such without the intervention of
the government law officers." (*Union P. R. Co.* v. *Hall et al.*
91 U. S. 355.) The writ is no longer regarded in this
country or England as prerogative in its nature, nor does
the right to it nor the power to issue it depend upon any of
the privileges or prerogatives of power, but it is treated as
an ordinary process in those cases to which it is applicable.
Hence, as the question at bar is one of public right, and the
object of the mandamus is to enforce the performance of a
public duty, the people being regarded as the real parties
in interest, it is not necessary that the relators should show
any special interest or particular right to be affected by the
result. It is next assigned as error that the petition does
not show that the town of Burns, at the election referred to
therein, received a majority of the votes cast thereat for the
permanent location of the county seat. This objection in-
volved at the argument two contentions: (1) That the facts
stated in the petition were insufficient to constitute a cause
of action, and (2), assuming them to be sufficient, that it is
not enough for the town of Burns to have received a majority
of all the votes cast upon the county-seat question, but that
the petition must show that it received a majority of all the
votes at said election for any and every purpose. The
objection upon the first point is to the effect that the
petitioners do not allege that it appeared from said can-
vass that said 512 votes so cast were a full and complete
majority of all the votes cast at said election, nor exhibit
any copy of the canvass, etc.; but the petition does allege
that the permanent location of the county seat was duly
submitted to the legal voters, as provided by the act, and
that thereafter the vote so cast at such election was duly
and regularly canvassed, as by law in such cases made
and provided, and that upon such canvass it was found
that the town of Burns received 512 votes, all of which
number of 512 votes so polled and voted by the legal
voters aforesaid in favor of establishing the county seat
of said Harney county at the said town of Burns, and that

the said 512 votes were a full and complete majority of all the votes cast, etc., and that the total sum of all the votes cast upon the permanent location of the county seat was the sum total of 1016 votes, and no other or greater number. As the objection treats the facts alleged as upon demurrer taking them as true, it does appear that the votes were duly canvassed as provided by law, and that it was found (because it so appeared from the canvass) that the town of Burns received 512 votes, which was a full and complete majority of all the votes so cast. Nor is the failure to attach as an exhibit a copy of the canvass fatal to the sufficiency of the complaint; for that is to be regarded rather as evidence of the facts to be alleged. It must be said, however, that these facts, although somewhat inartificially alleged, nevertheless present issuable matter which cannot stand confessed or admitted without conceding the town of Burns to be the permanent legal county seat, and putting the defendant in default in the performance of a public duty. It is manifest, then, that the trial court ought not to have allowed, upon the state of facts presented by the petition, a peremptory, but an alternative, writ to be issued; for the defendant may set up as a defense that the county seat has not been removed from Harney to Burns by a vote of the people, or some other proper defense which he may have to the action, and as the case of *State ex rel.* v. *Saxton et al.,* *supra,* shows he may do. The next question presented is, that while the petition sufficiently shows that the town of Burns received a majority of the votes on the county-seat question, it does not show and allege that it received a majority of the votes cast for every purpose at that election. That is to say, that if there was at the time of the election upon the county-seat question an election for county officers, the petition must show that there was a larger number of votes cast upon the county-seat question than for any county officer. These facts are not alleged, nor is it necessary unless the act requires that it must appear that a majority of all the votes cast at that election (which was a

regular election and included the election of county officers) were in favor of permanently locating the county seat at the town of Burns, and not a majority of the votes cast upon the single question of permanently locating the county seat. The act, after providing that the town of Harney shall be the temporary county seat of the county until otherwise located, etc., provides that " at the next general election the question of the location of a county seat shall be submitted to the legal voters of the county, and the place receiving the majority of all the votes cast shall be the permanent county seat of the county." (Sess. Laws, 1889, 47.) Under this statute the contention of counsel for the relator is, that it is sufficient to allege and show that the town of Burns received a majority of all the votes cast upon the county-seat question, and that the fact that it was a general election and county officers were elected at the same election, cannot affect the plain intention that it is a majority of the votes cast upon the county-seat question that is to govern.

In some of the states there is a constitutional provision restricting the removal of the county seat without the consent of the majority of the legal voters of the county, and in such cases, where two or more questions are submitted at the same election, it has been held that it must appear that a majority of the voters at that election had cast their votes in favor of removal before the county seat could be changed. Section 5, article VII, Ill. Const., provides that "No county seat shall be removed until the point to which it is proposed to be removed shall be fixed by law, and a majority of the voters of the county shall have voted in favor of its removal to such point." In *People ex rel.* v. *Wiant*, 48 Ill. 263, where this constitutional provision was interpreted, it was held that where an election on the question of the removal of a county seat happens to be held at the ·same time there is another election, as for a circuit judge, the votes cast on the single question of removal will not govern as to whether a majority of all the legal votes of the county were given in favor of removal, but it must appear that a majority of all

the votes cast at the election were so given.   In *Bayard* v. *Klinge*, 16 Minn. 249, it is held that when the constitution provides that a question must be submitted to a vote of the electors of the county, and requires a majority of electors voting thereon, it means a majority of electors who vote at such election, and not merely of them voting on the particular question.   In consonance with this principle, where the words of the constitution were "a majority of the legal voters of said county," it was held in *State ex rel.* v. *Lancaster Co.* 6 Neb. 474, that it does not mean a majority of those voting on the question to be submitted, but a majority of all the legal voters of the county.   (See also *County Seat of Linn Co.* 15 Kan. 500; *State* v. *Sutterfield,* 54 Mo. 391; *Braden* v. *Stumph,* 16 Lea. (Tenn.) 581; *Vance* v. *Austell,* 45 Ark. 400.)

Where county seats have been located, and there are constitutional provisions restricting such removal to the majority of the legal voters of the county, or without the consent of the majority of the electors of the county, the reasons are various and manifest why it has been construed and held under constitutional restrictions of this character to mean a majority of all the votes cast at such election, when there are means of ascertaining that fact, as by the vote for some county officer at the same election.   But in this state there are no constitutional restrictions in respect to this matter, and the intention of the statute must be collected from its language and the purpose it was designed to subserve.   It is not the case of the removal of a county seat once permanently located, but of a new county with its county seat temporarily located, and an act of the legislature providing a method for the voters of the county to determine the place where their county seat may be permanently located.   The only question, then, involved is the construction of the section cited.   Does it mean a majority of all the votes cast at such general election, or a majority of all the votes cast on the question of the location of the county seat?   While the section provides that the question of the location shall be submitted to the voters at the next general

XX OR.—11.

election, the object of such submission is to determine the place where it shall be permanently located by a "majority of all the votes cast." Its language is, "the place receiving the majority of all the votes cast," and not a majority of all the voters of the county, which, as we have seen as a constitutional restriction or in a statute (*State* v. *Winkelmeier,* 35 Mo. 103) when some other question was presented at the same election and the vote showed a larger vote than on the county-seat question, furnished clear and decisive evidence that a majority of the legal voters of the county had not voted for such change of location. "The place receiving the majority of all the votes cast" necessarily relates to the question of locating the county seat, and not to some other question which may be involved at such general election, and means that the "place receiving the majority of all the votes cast" on that question "shall be the permanent county seat of the county." This seems to us to be the plain intent of the statute in view of its language and the purpose to be subserved. In *State ex rel. Crocker* v. *Echols et al.* 41 Kan. 1, the statute provided that "after said election, the ballots on said question shall be canvassed in the same manner as in the election of county officers, and, if a majority of all the votes cast shall be in favor of establishing such high-school," the county commissioners are required to appoint trustees, etc.; and the court held that where an election is legally called, etc., to determine whether a county high-school shall be established, and at which a majority of the votes cast upon the proposition are in favor of the same, the proposition will be adopted although it may not have received a majority of all the votes cast upon other questions submitted at the same election. In *Walker* v. *Oswald,* 68 Md. 146, the court held that the rule that when an election is held at which the subject matter is to be determined by a majority of the voters entitled to cast ballots thereat, those absenting themselves and those who, being present, abstain from voting, are considered as acquiescing in the result declared by those actually voting, applies equally where, at a general election,

the measure, though receiving a majority of the votes cast on that subject, failed to receive a majority of the votes cast upon some other subject. (See also *Cass Co.* v. *Johnson*, 95 U. S. 360; *Gillspie* v. *Palmer*, 20 Wis. 572; *Sanford* v. *Prentice*, 28 Wis. 358.) Under provisions of this sort, as distinguished from those recognizing "a majority of the legal voters of the county," the cases cited sustain the argument that the assent of those voting on the subject or question was to be presumed by their silence as acquiescing in the action of the majority. Keeping this distinction in mind, and that the provision of our statute was to secure the permanent location of a county seat in a new county in which its county seat had only been temporarily located, and we think the words "the place receiving a majority of all the votes cast" mean cast on "the question of the location of the county seat," and not cast upon some other question which may have been voted on at that election. In this view the complaint was not defective and the objection cannot prevail. As the facts alleged were traversable, an alternative writ should have been allowed, which the argument indicated would have been except for an excusable inadvertence or mistake.

It follows that the judgment must be reversed and the cause remanded with directions to proceed in accordance with this opinion.